**DIRECT MAIL ADVERTISING ASSO-
CIATION, Inc., et al.,**

v.

**UNITED STATES POSTAL SERVICE
et al., Appellants.**

No. 72-1065.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 11, 1972.

Decided Feb. 22, 1972.

Petition for Rehearing Denied
March 15, 1972.

Mr. Joseph B. Scott, Atty., Department of Justice, of the bar of the Supreme Court of California, pro hac vice, by special leave of Court, with whom Mr. L. Patrick Gray, III, Asst. Atty. Gen., Messrs. Harold H. Titus, Jr., U. S. Atty., Alan S. Rosenthal, Atty., Department of Justice, Marvin H. Morse, Asst. Gen. Counsel, United States Postal Service, and Israel Convisser, Atty., United States Postal Service, were on the brief, for appellants. Mr. Morton Hollander, Atty., Department of Justice, also entered an appearance for appellants.

Mr. David E. McGiffert, Washington, D. C., with whom Messrs. William D. Iverson, and J. Edward Day, Washington, D. C., were on the brief, for appellees.

Before McGOWAN, MacKINNON and ROBB, Circuit Judges.

MacKINNON, Circuit Judge:

The Direct Mail Advertising Association, and several other substantial users of third-class postal services (hereafter, Direct Mailers) herein challenge the right of the United States Postal Service (Postal Service) under the Postal Reorganization Act of 1970, 39 U.S.C. § 101 et seq. (1970) to impose certain rates temporarily upon third-class mail which the Postal Service has requested the Postal Rate Commission to recommend as permanent rates. The Direct Mailers contend that the temporary increase in such rates, over existing rates, must be phased in as provided for permanent rates by 39 U.S.C. § 3626; while the Postal Service contends it is authorized temporarily to impose the full rate, without phasing, under the authority of 39 U.S.C. § 3641. We accept the interpretation of the statute that conforms to the general position of the Postal Service on this issue and accordingly reverse the decision of the District Court granting summary judgment in favor of Direct Mailers.

J

When Congress on August 12, 1970 enacted the law establishing the United

States Postal Service (hereafter, the Act), one of its principal goals was that eventually the Postal Service would become self-sufficient: be able to operate on the revenue received from postal rates and fees without the assistance of congressional appropriations. To this end the Congress declared in 39 U.S.C. § 3621:

> Postal rates and fees shall be reasonable and equitable and sufficient to enable the Postal Service under honest, efficient, and economical management to maintain and continue the development of postal services of the kind and quality adapted to the needs of the United States. Postal rates and fees shall provide sufficient revenues so that the total estimated income and appropriations to the Postal Service will equal as nearly as practicable total estimated costs of the Postal Service. . . . (84 Stat. 760).

Thus, the sufficiency of the revenue to be received from postal rates is all important. It is also important that such rates be fair to those using the mails. To accomplish both of these objectives Congress provided that postal rates would be fixed by the "Governors"[1] of the Postal Service in accordance with procedures prescribed by the Act.[2] Under such procedures the Postal Service requests the Postal Rate Commission (hereafter the Commission) to submit a recommended decision on changes in a postal rate. Upon receipt of this request the Commission, after opportunity for hearing, shall make a recommended decision in accordance with the policies of the Act.[3] The Commission transmits its recommended decision to the Governors,[4] who approve the recommended decision and order it placed in effect, or reject, modify or take other specified action.[5]

The Act then under the heading *"Subchapter II.—Permanent Rates and Classes of Mail,"* in section 3626 provides:

§ 3626. *Reduced Rates.*

> If the rates of postage for [certain classes of mail including third-class], as such rates existed on the effective date of this subchapter, are, on the effective date of the first rate decision under this subchapter affecting that class or kind, less than the rates established by such decision, a separate rate schedule shall be adopted for that class or kind effective each time rates are established or changed under this subchapter, with annual increases as nearly equal as practicable, so that—
>
> \* \* \* \* \* \*
>
> (2) the rates for [applicable classes of mail] shall be equal, on and after the first day of the fifth year following the effective date of the first rate decision applicable to that class or kind, to the rates that would have been in effect for such mail if this subsection had not been enacted. (84 Stat. 762)

This section of the Act cushions the impact of the initial changes in permanent rates applicable to third-class mail by requiring that the increase over prior rates be added to the user's rates in substantially equal installments over a five year period—thus the full impact of the increase is not felt until the fifth year. This is termed "phasing-in" the full rate.

Under the scheme of the Act, Congress is authorized to appropriate moneys from time to time equal to the deficiency in revenue which is caused by

---

I. 39 U.S.C. § 102(3) provides:
As used in this title—

\* \* \* \* \*

(3) "Governors" means the 9 members of the Board of Governors appointed by the President, by and with the advice and consent of the Senate, under section 202(a) of this title. (84 Stat. 720)

2. 39 U.S.C. § 3621 (84 Stat. 760).

3. *Id.* §§ 3622, 3624 (84 Stat. 760, 761).

4. *Id.* § 3624(c) (84 Stat. 761).

5. *Id.* § 3625 (84 Stat. 762).

"phasing-in" part of the rate.[6] Thus the Act contemplates that Congress will appropriate moneys equal to the revenue foregone by the phasing of rates, sufficient to permit the solvent operation of the Postal Service. If Congress fails to appropriate such moneys, the postal rate for the affected class may be adjusted to provide sufficient revenue to make up the deficiency.[7] In other words, the Postal Service would then increase the rates so as to receive the needed revenue from the users of the class of mail to which such rates were applicable.

In addition to the above described procedures for permanent rates, the Act also provides for temporary rates in certain instances. These provisions are contained in a separate subchapter immediately following the subchapter on permanent rates. It provides:

### Subchapter III—Temporary Rates and Classes

**§ 3641.** *Temporary changes in rates and classes.*

(a) If the Postal Rate Commission does not transmit to the Governors within 90 days after the Postal Service has submitted . . . to the Commission a request for a recommended decision on a change in rates of postage . . ., the Postal Service, upon 10 days' notice in the Federal Register, may place into effect temporary changes in rates of postage . . . it considers appropriate to carry out the provisions of this title.

Any temporary change shall be effective for a period ending not later than 30 days after the Commission has transmitted its recommended decision to the Governors.

\*　\*　\*　\*　\*　\*

(c) A rate of postage for a class of mail or a fee for a postal service under a temporary change under this section may not exceed the lesser of (1) the rate or fee requested for such class or service, or (2) a rate or fee which is more than one-third greater than the permanent rate or fee in effect for that class or service at the time a permanent change in the rate or fee of such class or service is requested under section 3622 of this title. (84 Stat. 763)

Thus, if the Postal Rate Commission does not act on a rate request by the Postal Service within 90 days of its submission, Subchapter III gives the Postal Service, after ten days' notice, authority to "place into effect temporary changes in rates . . . it considers appropriate to carry out the provisions of this title. Any temporary change shall be effective for a period ending not later than 30 days after the Commission has transmitted its recommended decision to the Governors." [8]

The temporary rate which the Postal Service may put into effect is limited by 39 U.S.C. § 3641(c), so that it may not exceed "the lesser of (1) the rate or fee requested for such class or service, or (2) a rate or fee which is more than *one-third greater* than the permanent

---

6. 39 U.S.C. § 2401(c) provides:

§ 2401. *Appropriations.*

\*　\*　\*　\*　\*

(c) There are authorized to be appropriated to the Postal Service each year a sum determined by the Postal Service to be equal to the difference between the revenues the Postal Service would have received if sections 3217, 3403–3405, and 3626 of this title and the Federal Voting Assistance Act of 1955 had not been enacted and the estimated revenues to be received on mail carried under such sections and Act. (84 Stat. 743).

7. 39 U.S.C. § 3627 provides:

§ 3627. *Adjusting free and reduced rates.*

If Congress fails to appropriate an amount authorized under section 2401 (c) of this title for any class of mail sent at a free or reduced rate under section 3217, 3403–3405, or 3626 of this title, or under the Federal Voting Assistance Act of 1955, the rate for that class may be adjusted in accordance with the provisions of this subchapter so that the increased revenues received from the users of such class will equal the amount for that class that the Congress was to appropriate. (84 Stat. 763).

8. 39 U.S.C. § 3641(a) (84 Stat. 763).

rate or fee in effect for that class or service at the time a permanent change in the rate or fee of such class or service is requested [of the Postal Rate Commission]." (Emphasis added.) It is the relationship between this provision concerning temporary rates, and the one concerning phasing of permanent rates contained in Subchapter II, that raises the issues here presented. The Direct Mailers contend that the phase-in requirement of section 3626, contained in the subchapter on Permanent Rates, also applies to temporary rates placed into effect under section 3641, part of the subchapter on Temporary Rates.

## II

The Postal Service filed its initial request for rate increases with the Postal Rate Commission on February 1, 1971. The full permanent rate requested for one of the types of third class mail was 28¢ as compared with a prior rate of 22¢. The Postal Rate Commission not having acted within 90 days, the Postal Service put a temporary rate increase into effect on May 16, 1971. This action increased the rate to 23¢, the level that would be permitted on the first step of the phase-in of the requested permanent rate. The Postal Service then made a request to Congress for appropriations that included an amount equal to the revenue that would be foregone by the operation of a first step rate increase for this class of mail. After Congress made its appropriation, the Postal Service construed the amount actually appropriated to have omitted the money requested for third class rates.[9] It then announced that it would increase the temporary rate for third class mail to the full amount of the requested permanent rate—28¢. The Di-

rect Mailers[10] then filed this suit in the District Court for declaratory and injunctive relief, seeking, *inter alia*, to establish that temporary rates are subject to the phasing requirement of section 3626.

The District Court granted the appellees' motion for summary judgment with respect to the question of phasing temporary rates. The order enjoined the Postal Service from putting into effect a temporary rate higher than the first step level of the permanent rates requested until the first step rates had been in effect for one year—reflecting the equal annual installment requirement of section 3626. A stay of the order was denied, and this appeal followed. We denied a motion by the Postal Service for summary reversal or for a stay pending appeal, but—in light of the importance of the matter presented by this case—we have expedited its consideration on the merits.

## III

This brings us to an examination of the statute to determine whether temporary rates are subject to the phase-in requirements applicable to permanent rates.

The language of the section that deals with phasing, section 3626, offers no indication that it should apply to temporary rates. Indeed, the requirement only comes into play *after* the first rate decision is made under Subchapter II—which deals exclusively with permanent rates. This first rate decision has not yet been rendered. Appellees, however, seek to impose the phasing requirement on temporary rates through the section which limits the amount by which a temporary rate can exceed prior rates. This is section 3641(c), above quoted,

9. The parties contest whether the money to compensate for phasing third class mail was actually excluded from the lump sum that Congress appropriated, and whether it is the Postal Rate Commission or the Postal Service that must make the determination in the first instance that appropriations have failed. Since we have concluded that, in any case, phasing is not

required by the Act for temporary rates, we do not reach either question.

10. The plaintiffs-appellees are Direct Mail Advertising Association, Inc., GEM International, Inc., National Broadcasting Company, Inc., and The Associated Third Class Mail Users.

which provides that a temporary rate shall not exceed the lesser of a one-third rate increase or "the *rate or fee requested* for such class or service." Appellees argue that the "rate or fee requested" should be read to mean the level of the annual step authorized to be imposed under section 3626 with respect to the full permanent rate. This would limit the Postal Service, under the factual circumstances here existing, to imposing a temporary rate which did not exceed the first year rate that would be permitted under the phasing requirements applicable to permanent rates. We find this suggested interpretation to be incompatible with the intent expressed by Congress throughout the Act. We interpret the "rate or fee requested" in section 3641 of the Act to refer to the full permanent rate requested.

The scheme of the Postal Reorganization Act is for the Postal Service to request the Postal Rate Commission to submit to the Governors a recommended rate decision.[11] Section 3626 only provides that if "the rates established by the [first recommended decision]"[12] represent an increase over existing rates then "a separate rate schedule" shall be adopted representing the reduced level of phased in rates.[13] While a metaphysical analysis might come to the conclusion that a request for a full rate, subject to a reduction by the operation of a separate provision means that the reduced rate is the rate requested, a common sense interpretation of the language of the statute leads to the opposite result.

We also note that the request of the Postal Service with respect to its third class mail regular bulk rates set forth "28" under the caption "Proposed Full Rates (cents)." Thus, the Postal Service, in this instance, interpreted the Act as calling for it to request the full permanent rate (not the reduced phased-in rate), and that is the rate it did request (App. p. 45). The document also requested full permanent rates in other mail classes. If Congress meant that the phasing requirement, which on its face does not become operative until the "first rate decision" would be applicable to temporary rates in effect prior to that decision, we believe it would have been more explicit in expressing this in section 3641(c).

Congress did consider the problem of the impact of temporary rates on users, and acted to insure that they did not have an unduly disruptive effect by limiting them to the lesser of the full requested rate or a one-third increase. The language constituting the limitation on temporary rates appeared for the first time in the Conference Committee. The House bill had no phasing requirements at all,[14] and the Senate bill had only a time limit on increases represented by temporary rates.[15] The appearance of the provision limiting temporary rates in a separate subchapter, from the subchapter providing for phasing, leads to the conclusion that Congress relied on the restrictions it imposed on temporary rates in section 3641(c), as being the exclusive limitations it intended to apply to the imposition of temporary rates.

In formulating the level of temporary rates, the Postal Service may place into effect that rate "it considers appropriate to carry out the provisions of this title."[16] We conceive it to be a central purpose of the title to place the Postal Service on a self-sufficient basis. The Direct Mailers argue that the intent of

11. 39 U.S.C. § 3622(a) (1970), (84 Stat. 760).

12. The language of the Act leads us to conclude that the Postal Rate Commission's decision *establishes* the full permanent rate, and only afterward is a reduced rate schedule put into effect. That the rate *established* is not a phased rate infers that the rate *requested* is not a phased rate either.

13. The title of section 3626 is "Reduced rates."

14. H.R. 17070, 91st Cong., 2d Sess. (1970).

15. S. 3842, 91st Cong., 2d Sess. (1970).

16. 39 U.S.C. § 3641(a) (1970), (84 Stat. 763).

Congress to cushion the impact of new rates by phasing is controlling. However, while we recognize its force, we consider it to be subordinate to the intent that the Postal Service be as near self-sufficient as possible. Temporary rates were one means to this end; reduced rates were contemplated only insofar as appropriations would counterbalance their effect so as not to obstruct the primary goal. This mandate to the Postal Service with respect to the level at which it may set temporary rates would be frustrated by requiring these rates to be phased, since that would unduly burden the fiscal operation of the Postal Service. The appropriations process, on which phasing is contingent, is not well suited for supplying revenue deficiencies in connection with a situation calling for temporary rates. If Congress were to make an appropriation for revenue foregone with respect to temporary rates—prior to the time that a final decision is reached by the Postal Rate Commission—it would be placed in the position of having to assume the propriety of the requested full rate in order to have a base from which to compute the reduction represented by phasing.[17]

Appellees point out, quite correctly, that an interpretation of the Act which allows the temporary rate to equal the full permanent rate requested would give rise to a yo-yo effect; the rate would rise sharply to the full level, and on implementation of the Postal Rate Commission's final decision, would drop to the first phased level. While a "yo-yo" effect is not illegal per se, it is argued that such fluctuation of postal rates could not reasonably have been intended. As we have already noted, Congress did deal with the question of the initial effect of high temporary rates, and it is our interpretation of the Act that Congress chose to resolve it by absolute limits rather than by phasing.[18] Any disruption in the orderly progression of postal rate increases would be limited in any event—since temporary rates must end within thirty days of the Postal Rate Commission's decision. The legislation assumes that the Commission will perform its duty expeditiously and that the proceedings before the Commission would not be greatly protracted. Moreover, comparable swings in the level of the postal rates are otherwise contemplated in the Act, since appropriations could fail the first year, be forthcoming the second, and fail the third— all consistent with the other requirements of the budget.

In accordance with the foregoing interpretation of the Act, we reverse the order of the District Court granting summary judgment to the appellees, and remand the case for proceedings consistent with this opinion.

Judgment accordingly.

17. This concern was voiced in Congressional debate over the appropriation request by the Postal Service when Senator Boggs stated "if [Congress] spelled out how much money should be spent to aid the phase in of mail rates it would, in effect, be giving direction as to what these rates should be." 117 Cong.Rec. S 10301 (daily ed. June 29, 1971). In addition to the problems presented by assuming the propriety of the rates presented by the Postal Service, an appropriation for temporary rates which are subject to phasing confronts the difficulty of actually computing the amount of the annual increments in the phasing which determines the amount of revenue foregone.

The imprecision in determining phased steps for temporary rates arises because section 3626 requires equal installments each year, until five years from the date of the first permanent rate decision—a date that has not yet arrived, and cannot be predicted.

18. We note that under our interpretation of the Act, even postal users who are initially subject to full temporary rates will still be able to obtain a complete five years of the phasing requirement. Their monetary loss is measured only by the time value of the difference in cost between the phased rate and the full rate.